Filed 4/25/23  P. v. Martinez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MANUEL ESCOBEDO MARTINEZ,<br><br>    Defendant and Appellant. | D079235<br><br>(Super. Ct. Nos. SCN391380 & SCN400711)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on April 4, 2023, be modified as follows:

1.    On page 3 of the opinion, the last sentence in the second to last paragraph currently reads:

> "At that time, the trial court shall also clarify whether Appellant's indeterminate sentence on count 1 in the Knife Case runs concurrent or consecutive with his sentence in the Gun Case."

That sentence is stricken and replaced with the following:

> "At resentencing, the trial court has authority under the full resentencing rule to make any new sentencing decision it deems appropriate, including whether to run the sentence on count 1 in

the Knife Case concurrent or consecutive to the sentence in the Gun Case, as long as the new aggregate sentence does not exceed the original sentence."

2.      On page 55 of the opinion, the last two sentences in the paragraph before the DISPOSITION currently read:

"At that time, the trial court can clarify whether it intended to run the sentence on count 1 in the Knife Case concurrent or consecutive to the sentence in the Gun Case.  (See *Buycks*, at p. 89 [on remand, 'the resentencing court has jurisdiction to modify *every* aspect of the sentence, and not just the portion' that was the basis of the resentencing hearing].)"

Those sentences are stricken and replaced with the following:

"At resentencing on remand, the trial court can make any new sentencing decision it deems appropriate, including whether to run the sentence on count 1 in the Knife Case concurrent or consecutive to the sentence in the Gun Case, as long as the aggregate sentence does not exceed the original sentence.  (See *Buycks*, at p. 89 [on remand, "the resentencing court has jurisdiction to modify *every* aspect of the sentence, and not just the portion" that was the basis of the resentencing hearing]; *Dix v. Superior Court* (1991) 53 Cal.3d 442, 456 ["resentence may not exceed the original sentence"].)

There is no change in the judgment.

Appellant's petition for rehearing is denied.


HUFFMAN, Acting P. J.


Copies to:  All parties


2

Filed 4/4/23  P. v. Martinez CA4/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079235 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. SCN391380 & SCN400711) |
| MANUEL ESCOBEDO MARTINEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael D. Washington, Judge.  Affirmed in part; reversed in part, and remanded with instructions.

Alissa Bjerkhoel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

In two separate cases, Manuel Escobedo Martinez (Appellant) was charged with 23 crimes committed on five separate days in the span of less than a year, including premeditated murder and three counts of attempted premeditated murder. The trial court ordered separate jury trials so that Appellant was first tried on the charges involving his use of a gun (the Gun Case) and then on the charges involving his use of a knife (the Knife Case).[1] Following his convictions on 18 counts, the court sentenced Appellant to 110 years to life plus 21 years eight months in the Gun Case, and seven years to life plus seven years eight months in the Knife Case. On appeal, Appellant asserts eight claims of error.

In the Gun Case, he contends (1) the trial court erred by ordering a joint trial of the three incidents where he used a firearm; (2) there was insufficient evidence of premeditation and deliberation to support the jury's convictions on first degree murder and attempted premeditated murder (counts 1 and 2, respectively); and (3) there was insufficient evidence identifying him as the perpetrator who assaulted and threatened a couple at gunpoint in the second incident (counts 7 through 12). Under Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), Appellant further contends (4) the People's evidence on the gang enhancement allegations fail to satisfy amended Penal Code[2] section 186.22, subdivision (b), and (5) the entire judgment should be reversed because admission of gang evidence rendered his trial fundamentally unfair and he is now entitled to bifurcation

---

[1]  Hon. Michael D. Washington was the trial judge in both cases.

[2]  All further undesignated statutory references are to the Penal Code.

of the gang enhancement allegations under newly added section 1109. He also asserts the evidence was insufficient to support the jury's true findings on the gang enhancements even under former section 186.22.

In the Knife Case, Appellant claims (6) prejudicial prosecutorial error occurred when the prosecutor showed the jury a photograph of him making a gang sign during her opening statement and referred to his "booking" photograph when questioning a witness during trial; and (7) the abstract of judgment should be amended to reflect his indeterminate sentence on count 1 runs concurrent with his sentence in the Gun Case.

Finally, Appellant asserts (8) he is entitled to a new sentencing hearing under retroactive application of several new sentencing laws that became effective after his sentencing.

As the People properly concede, Assembly Bill 333's amendments to section 186.22, subdivision (b), require that we vacate the jury's true findings on the gang enhancement allegations as to counts 7 through 12. We shall remand the matter to the trial court for further proceedings, including possible retrial if the People elect to retry the gang enhancement allegations. Current sentencing law, including any changes implemented during the pendency of this appeal, shall apply at resentencing on remand. At that time, the trial court shall also clarify whether Appellant's indeterminate sentence on count 1 in the Knife Case runs concurrent or consecutive with his sentence in the Gun Case.

We reject all other contentions of error by Appellant, and affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Charges*

Appellant was charged in two separate cases with committing a total of 23 crimes arising from five separate incidents in 2017 and 2018. Although the trial court found that all five incidents were "connected" and of "equal weight" as a result of Appellant's "assaultive . . . behavior," the court ruled there would be two trials, one trial involving the Gun Case and the second trial involving the Knife Case.

In the Knife Case, case no. SCN391380, Appellant was charged with 6 counts, including attempted premeditated murder (§§ 187, subd. (a), 189), arising from crimes involving his use of a knife on October 14 and November 19, 2017. They are:

| Count | Victim | Charge/Enhancement | Penal Code Section |
|-------|--------|--------------------|--------------------|
| **November 9, 2017** | | | |
| 1 | Hilario C.[3] | Attempted Premeditated Murder | 664/187(a), 189 |
| | | Infliction of Great Bodily Injury (GBI) | 12022.7(a) |
| | | Personal Use of Deadly Weapon | 12022(b)(1) |
| 2 | Hilario C. | Assault with Deadly Weapon | 245(a)(1) |
| | | Infliction of GBI | 12022.7(a) |
| **October 14, 2017** | | | |
| 3 | Josue S.R. | Attempted Murder | 664/187(a) |
| | | Infliction of GBI | 12022.7(a) |
| | | Personal Use of Deadly Weapon | 12022(b)(1) |
| 4 | Baldemar R. | Attempted Murder | 664/187(a) |
| | | Infliction of GBI | 12022.7(a) |
| | | Personal Use of Deadly Weapon | 12022(b)(1) |
| 5 | Josue S.R. | Assault with Deadly Weapon | 245(a)(1) |
| | | Infliction of GBI | 12022.7(a) |
| 6 | Baldemar R. | Assault with Deadly Weapon | 245(a)(1) |
| | | Infliction of GBI | 12022.7(a) |

---

[3]     Pursuant to California Rules of Court, rule 8.90(b), we use the first name and last initial of victims and witnesses to protect their privacy.

4

In the Gun Case, case no. SCN400711, Appellant was charged with 17 counts including first degree murder (§ 187, subd. (a)), arising from crimes involving his use and/or discharge of a firearm on April 7, July 22, and September 22, 2018. They are:

| Count | Victim | Charge/Enhancement | Penal Code §Section |
|---|---|---|---|
| **September 22, 2018** | | | |
| 1 | Antonio M. | First Degree Murder<br>Personal Discharge of Firearm | 187(a)<br>12022.53(b)–(d) |
| 2 | Milan G. | Attempted Premeditated Murder<br>Personal Discharge of Firearm | 664/187(a), 189<br>12022.53 (b)–(d)) |
| 3 | Boban B. | Assault with Semiautomatic Firearm<br>Personal Use of Firearm | 245(b)<br>12022.5(a) |
| 4 | | Felon in Possession of Firearm | former 29800(a)(1) |
| **July 22, 2018** | | | |
| 5 | Adolfo M. | Attempted Criminal Threats | 664/422 |
| 6 | Adolfo M. | Dissuading a Witness by Force or Threat | 136.1(b)(1) & (c)(1) |
| 7 | Ninfa R. | Criminal Threats<br>To Benefit Criminal Street Gang<br>Personal Use of Firearm | 422<br>former 186.22(b)(1)<br>12022.5(a) |
| 8 | Ninfa R. | Dissuading a Witness by Force or Fear<br>To Benefit Criminal Street Gang<br><br>Personal Discharge of Firearm | 136.1(b)(1) & (c)(1)<br>former 186.22 (b)(1) & (b)(4)<br>12022.53(b) |
| 9 | Ninfa R. | Assault with Semiautomatic Gun<br>To Benefit Criminal Street Gang<br>Personal Use of Firearm | 245(b)<br>former 186.22(b)(1)<br>12022.5(a) |
| 10 | Adolfo M. | Criminal Threats<br>To Benefit Criminal Street Gang<br>Personal Use of Firearm | 422<br>former 186.22(b)(1)<br>12022.5(a) |
| 11 | Adolfo M. | Dissuading a Witness by Force or Threat<br>To Benefit Criminal Street Gang<br><br>Personal Use of Firearm | 136.1(b)(1) & (c)(1)<br>former 186.22(b)(1) & (b)(4)<br>12022.53(b) |
| 12 | Adolfo M. | Assault with Semiautomatic Gun<br>To Benefit Criminal Street Gang<br>Personal Use of Firearm | 245(b)<br>former 186.22(b)(1)<br>12022.5(a) |
| **April 7, 2018** | | | |
| 13 | John M. | Assault with Deadly Weapon | 245(a)(1) |
| 14 | | Discharge of Firearm with Gross Negligence | 246.3(a) |
| 15 | Claudia A. | Assault with a Firearm<br>Personal Use of Firearm | 245(a)(2)<br>12022.5(a) |

5

| 16 | Artemio G. | Assault with Firearm | 245(a)(2) |
| | | Personal Use of Firearm | 12022.5(a) |
| | | GBI Enhancement | 12022.7(a) |
| 17 | | Felon in Possession of Firearm | former 29800(a)(1) |

The Gun Case was tried first, so we start our discussion with the evidence on those charges. We later discuss the trial court's joinder ruling in further detail in connection with Appellant's claim of error.

## II.

## *The Gun Case Trial*

A. *A Stabbing, Followed by a Shooting, at a Quinceañera on April 7, 2018 (Counts 13–17)*

Patricia P. was hosting a large quinceañera for her teenage daughter at a banquet hall on April 7, 2018. About one hundred people attended the party, including Appellant and his brother, Jose Luis Martinez. Jose Luis is married to Patricia's sister. Patricia knew Appellant as "Cheo," but she did not know him well.

At the party, one of Patricia's younger brothers got into a fight with Jose Luis on the dance floor. When Patricia heard there was a fight, she went to the dance floor and started pushing Jose Luis "through the hallway" towards the front door, telling him, "Please leave. You guys have to go." Patricia then saw Appellant behind Jose Luis. Appellant was "really mad." He screamed out, "You guys don't know who I am. I'm from *Mara*."[4] Patricia continued to push Jose Luis out the banquet hall because she was "scared of just everything that was going on."

---

4    "Mara Salvatrucha," also known as " 'MS–13,' " is a criminal street gang. (See *Bologna v. City and County of San Francisco* (2011) 192 Cal.App.4th 429, 432.)

6

At some point, Patricia's friend, John M., came up and asked her if everything was okay because Patricia was crying. Appellant was "mad." John felt Appellant was threatening Patricia, so he grabbed Appellant by the neck and put him in a headlock. John did not have Appellant in the headlock for "very long" because Patricia screamed at John, "Let him go! Let him go!" When John let go, Appellant "kind of turned around on [John]" and got behind him. Appellant was holding "something silver in color" in his hand. Though she was "not sure if it was a knife," Patricia saw Appellant stab John twice, including in the chest area. Another one of Patricia's brothers grabbed Appellant's arm to thwart a further attack.

As Appellant and Jose Luis left the party, they vowed they would return. John had not noticed or felt anything was wrong with him, until Patricia told him, "Johnny, I think you got stabbed." John was bleeding on his "right side." He took off his shirt and "realized" he had been stabbed. He did not seek medical treatment for what he described as a "superficial" chest wound.

Patricia's younger brother, Miguel G., was also at the party. During the evening Miguel heard one of his brothers and Jose Luis argue, and pulled them apart when the argument turned physical. Miguel then heard Patricia and Appellant arguing, with Appellant "yelling and screaming at the top of his lungs" that he was a member of the "Mexican Mafia." Miguel saw John put Appellant in a headlock and after John let Appellant go, Appellant pulled out a "sharp, long" "ice pick" from his back pocket and "started stabbing John." Miguel "grew up in the same neighborhood" as Appellant and had known him for "at least a good . . . fifteen-plus years."

Gerardo G., his girlfriend, Claudia A., and their two teenage children also attended the party. Patricia and her sister, who is married to Jose Luis,

7

are Gerardo's first cousins.  Gerardo had known Jose Luis and Appellant for more than 15 years, and sometimes would socialize with Jose Luis at family gatherings.  Gerardo left the party with his family and, as they were saying their goodbyes to Gerardo's cousin Artemio G. and Artemio's kids in the parking lot, Appellant and Jose Luis came towards Gerardo and his family.

Appellant was yelling for "Snoopy,"[5] and Gerardo told him, "Hey, relax.  Everybody's gone.  What's your problem?"  Appellant responded by coming within about six feet of Gerardo and Claudia.  He pulled out a black semiautomatic gun from his waistband and pointed it at Claudia's face.  Claudia yelled at Appellant, "Kick back.  There's kids."  Jose Luis said, "I don't give a shit . . . All you guys are fucked."  Claudia turned to Appellant and told him, "If you have the balls to pull it, pull the trigger.  But just remember who's all here.  They're going to see what you did."

Appellant fired the gun into the ground.  Some other "gentleman" grabbed Gerardo and Claudia and pushed them to the ground.  Gerardo's children were already inside the family's truck.  Gerardo heard a second gunshot.  He looked up and saw Artemio "grab his forehead and fall back."  Artemio had been struck with the bullet, which had "grazed" his forehead.  Appellant and Jose Luis ran away to a silver or gray SUV, and Gerardo called 911. Artemio was treated at the emergency room for an approximate one-inch laceration to his scalp.

---

[5]     "Snoopy" was identified as another of Patricia's family members named "George," who had also attended the party.

B.     *A Couple Is Threatened at Gunpoint During Their Backyard Dinner Party on July 22, 2018 (Counts 5–12)*

Adolfo M. and his wife, Ninfa R., were hosting a family dinner party in their backyard on the evening of July 22, 2018.  At some point, Adolfo was alerted there was a man inside his brother's truck that was parked in an adjacent alley.  Adolfo and his brother found Appellant sitting inside the truck "with a handful of keys."  Appellant got out and said he was "looking for drugs or something" and he was not trying to steal the truck.  Adolfo told Appellant he did not believe him and that he needed to wait for the police.  As he walked away, Appellant told Adolfo, "I'm going to come back and I'm going to kill you."

About 30 minutes later, Appellant returned to Adolfo's backyard, this time holding a chrome-colored gun.  Appellant came to the backyard gate and called Adolfo over to him.  Adolfo complied; he was afraid Appellant would shoot him or into the backyard where he had his family.  Appellant tried to force the gate open.  He pointed the gun at Adolfo and threatened "he was going to kill" Adolfo.

Ninfa went to the gate and saw that Appellant was "angry," and he had a gun.  Ninfa told Adolfo to "[w]alk a little bit further back" so she could talk to Appellant; she wanted to try and calm Appellant.  Ninfa knew Appellant's family.  Appellant demanded to know if anyone had called the police.  Ninfa told him that no one had, and that he should leave.  Appellant refused and said, "No, because I want to make sure that you're not going to call [the police] because you don't know who I am."  At some point, Appellant racked the slide on the gun.  Ninfa and Adolfo were scared he was going to shoot.  Appellant had the gun pointed at the couple from a short distance.

9

Despite Ninfa's repeated assurances they would not call the police, Appellant threatened Ninfa, "If you call, I'll kill you." He said: "I'm going to put some fucking bullets in you." "I'm a big motherfucker." "This is my neighborhood" "You don't know who I am . . . I'm. . . , a badass from the mafia." He said he was from "Westside," and told Ninfa again not to call the police and that "he had friends."

Ninfa tried to calm down Appellant by telling him, "I know your family" and "love your mother."[6] When Appellant responded that his mother "was everything for him," Ninfa told him she wanted him to respect her and her family, and to leave them alone. "[T]hen finally he left." But as he left, he told Adolfo "he couldn't kill [him] there but that wherever he found [him], he would kill [him]."

Ninfa and Adolfo did not call the police because they were "frightened" and "scared." Rather, Adolfo went to the hospital and the police contacted them after they had told the hospital staff what had happened in their backyard. A police officer wanted to meet them at their house to take a report, but Ninfa told him no. She did not want the police at her house because she was "afraid" Appellant would find out and she had "promise[d]" Appellant that she would not call the police. A few weeks after the police came to her house in May 2019 (a few months before trial), Appellant's

---

[6]    Ninfa identified Appellant from a photographic line-up with the police and in court as "the person that came to [her] house." Although she testified she did not know or "have any friendship" with Appellant, Ninfa had met him once at her nephew's funeral and she knew Appellant's mother "from school," his girlfriend "Yasmin" and the couple's daughter. Yasmin S. was involved in one of the two incidents tried in the Knife Case. (See our discussion of the Knife Case at Section III.B, *post*.)

brother—who was sitting in the courtroom the day Adolfo and Ninfa testified—paid her a visit to ask about what happened in July 2018 in the backyard. Adolfo had also told his 35-year old son to move out because he was afraid Appellant would come back and hurt him.

The People's gang expert testified the "Westside gang" is a criminal organization or "territorial street gang" comprised of about 124 members who were mostly males and who identify with "the west side of Escondido." The gang has existed for about 30 years, and Adolfo and Ninfa's home was within the gang's territory.

The expert opined Appellant is a member of the Westside gang. Appellant was shown in photographs using his hands to make a "W," which stood for Westside. He had tattoos showing his gang membership, including a "WSG" on his chest which was an "abbreviation for Westside gang"; a "W" on his right forearm; the word "Westside" above his lip; and the words "Westside" and "Gang" across the back of his head and down his back.

The expert was asked the following hypothetical based on the facts of the July 22 incident already in evidence: A gang member acting within his gang's territory points a gun at a "normal citizen" and threatens to kill him or her while saying, "I'm from Westside. I have friends. And this is my neighborhood." The expert opined this crime would "benefit" a "criminal street gang . . . like Westside" because by mentioning "the neighborhood or the *barrio* or the gang itself, you imply that you're not the only person capable of retaliation or retribution. That, essentially, if you violate the terms that I've discussed or that I've laid out [such as not calling the police], you'll be hurt or injured by the other gang members. It applies to the neighborhood mentality." The expert added the "fear" instilled in the

11

neighborhood by such conduct "benefit[s]" Westside because it "prevents a witness from cooperating or coming forward," allowing the gang to operate without interference from law enforcement.

C.    *Appellant Accidentally Killed His Brother While Shooting Another Man Outside a Bar on September 22, 2018 (Counts 1–4)*

Appellant tried to enter a bar in Escondido on the night of September 22, 2018, but the bouncer would not let him in because his identification had expired.[7]  Appellant tried again with his brother's identification and was stopped.  He was "frustrated he couldn't come in."  The bouncer went inside to tell Appellant's brother, Antonio Martinez, and his friend, Edgardo S., that Appellant could not enter.  When Antonio and Edgardo came out, the three men tried to bribe the bouncer with $20 to $40 to allow Appellant in.  The bouncer refused.  The three men left in Edgardo's truck, with Edgardo driving.  As they drove away, the truck's tires did a "burn-out" in front of the bar.

Boban B. was standing just outside the bar when the truck peeled out of the parking lot.  Boban "flipped . . . off" Appellant and his companions in

---

[7]    Video surveillance cameras were located both inside and outside the bar, and at nearby businesses.  A police detective watched "all of the video" surveillance footage recovered from the crime scene and a "compilation" of relevant footage of "different shots, . . . different views . . . to follow each of [the involved] individuals throughout the bar during the [relevant] time" was created.  The compilation video was shown to the jury with the detective providing explanations of the individuals and events seen in the video.  The video compilation was also shown to the jury during the testimony of various witnesses.  Our account of the events on September 22, 2018 derives from both the witnesses' testimony and the detective's testimony narrating the compilation video.  We were not provided the video as part of the record on appeal.

the truck for "burning out." Edgardo drove the truck down the street, made a U-turn and returned to the bar. He stopped the truck and dropped off Appellant and Antonio at an intersection near the bar. Appellant and Antonio then walked back towards the bar to confront Boban.

As they walked up to Boban, Appellant pulled out a gun from his waistband and pointed it at Boban's head. Justyn B., a bar patron, was standing outside the bar when he saw Appellant point the gun at Boban and taunt him, "Not so bad now, motherfucker." Antonio then punched Boban "multiple times in the face, pushing him back."

When Milan G. saw Antonio punching Boban, his nephew, he ran over to stop the assault. Milan lunged at Antonio and once he grabbed Antonio to pull him off Boban, Appellant fired the first shot from his gun. The recoil and the muzzle flash from the first gunshot could be seen on the surveillance video. Appellant fired the gun multiple times; witnesses heard three gunshots. In the video, Appellant can be seen taking "a couple of small steps *forward* from the first shot."[8]  (Italics added.)

Milan "heard the shots go off and felt it." He then immediately felt pain in his upper abdomen and ribs. He let go of Antonio and laid down on the ground. He was bleeding and felt "a lot of pain" in his arm

One of the shots fired by Appellant struck his brother Antonio in the chest. After Antonio fell down on his knees, Appellant dragged him into the street and was attempting CPR on his brother. Edgardo, who had returned in his truck, also tried to help but he got back into his truck and fled. Justyn

---

[8]    The detective narrating the compilation video explained Appellant was standing in an approximate location of about seven feet from the outside wall of the bar when he fired the second shot.

and a bouncer ran out of the bar to render aid to Appellant's brother. While Justyn was down on his knees giving Antonio CPR, Officer Timothy Hamilton arrived in a marked patrol car. As Officer Hamilton got out of his patrol car, Justyn pointed him to Appellant, who was standing 15 or 20 feet away, and said, "There's the shooter." Appellant took off running, while Justyn continued CPR on Antonio, who faded in and out consciousness while begging for help.

Officer Hamilton pursued Appellant on foot. After a brief chase and the arrival of other officers, Appellant was cornered in an alley and arrested. Appellant did not have the gun on him at the time of his arrest. However, based on his review of footage from his body-worn camera, Officer Hamilton retraced the route Appellant had run during the chase and found a loaded semiautomatic gun under a dumpster enclosure in the alley. During the chase, Officer Hamilton's body-worn camera recorded a sound— "two bangs"—consistent with Appellant's gun hitting the side of the enclosure as Appellant rounded a corner, out of the body-worn camera's frame.

A criminalist concluded from ballistic testing that an expended bullet and cartridge casings recovered at the crime scene were fired from the gun found in the alley. Appellant's DNA was on the gun, and his hand tested positive for gunshot residue.

Appellant's brother died of a single gunshot wound to the chest before arriving at the hospital. Milan was hospitalized for two days. He had suffered six gunshot wounds, including to his chest, forearm, wrist and back, that his treating emergency physician determined were caused by three bullets. A year later, Milan did not have full function of his fingers and full dexterity; he suffered nerve damage and muscle atrophy.

14

D.    *Defense Case*

Appellant's older brother, Francisco M., testified their sister, Maria M., lived about a block away from Ninfa's home and that their mother and Ninfa were friends. Francisco was at Appellant's preliminary hearing and heard Ninfa testify that she was "scared" of Appellant after he threatened to kill her at gunpoint. After hearing her testimony, and before trial, Francisco and Maria went to Ninfa's house "to ask about the incident." He testified he did not intend to "cause trouble or to make [Ninfa] uncomfortable." Maria confirmed she and Francisco visited Ninfa at her home shortly before Appellant's trial.

E.    *Jury Verdicts*

The jury reached verdicts in the Gun Case in October 2019.

As a result of the September 22, 2018 shooting outside the bar, the jury convicted Appellant of first degree murder of Antonio (§ 187, subd. (a); count 1); attempted premeditated murder of Milan (§§ 664/187, subd. (a); count 2); assault with a semiautomatic firearm on Boban (§ 245, subd. (b); count 3); and possession of a firearm by a felon (former § 29800, subd. (a)(1); count 4). The jury found true the associated firearm enhancements on counts 1 through 2 (§§ 12022.53, subds. (b)–(d)) and count 3 (§ 12022.5, subd. (a)).

From the July 22, 2018 incident at Adolfo and Ninfa's backyard, Appellant was convicted of criminal threats against Ninfa (§ 442; count 7); dissuading Ninfa from reporting a crime by force or fear (§ 136.1, subds. (b)(1) & (c)(1); count 8); assault with a semiautomatic firearm on Ninfa (§ 245, subd. (b); count 9); criminal threats against Adolfo (§ 422; count 10); dissuading Adolfo from reporting a crime by force or fear (§ 136.1, subds. (b)(1) & (c)(1); count 11); and assault with a semiautomatic firearm on

15

Adolfo (§ 245, subd. (b); count 12). The jury found true the gang enhancement allegations as to counts 7, 9 and 12 (former § 186.22, subd. (b)(1)) and counts 8 and 11 (former § 186.22, subd. (b)(1) & (4)), as well as the firearm enhancements on counts 7, 9, 10 and 12 (§ 12022.5, subd. (a)) and counts 8 and 11 (§ 12022.53, subd. (b)). The jury acquitted Appellant of attempted criminal threats against Adolfo (§§ 664/422; count 5) and dissuading Adolfo of reporting a crime by force or fear (§ 136.1, subds. (b)(1) & (c)(1); count 6).

Last, as to the April 7, 2018 shooting at the quinceañera, the jury convicted Appellant of discharging a firearm with gross negligence (§ 246.3, subd. (a); count 14); assault with a firearm on Claudia (§ 245, subd. (a)(2); count 15); assault with a firearm on Artemio (§ 245, subd. (a)(2); count 16); and possession of a firearm by a felon (former § 29800, subd. (a)(1); count 17). The jury found true the firearm enhancements on counts 15 and 16 (§ 12022.5, subd. (a)) and the GBI enhancement on count 16 (§ 12022.7, subd. (a)).

## III.

### *The Knife Case Trial*

A. *A Stabbing at a House Party on October 14, 2017 (Counts 3–6)*

Appellant attended a birthday party at a restaurant on the evening of October 14, 2017. When the party ended, Baldemar R. invited a small group of his friends at the restaurant back to his house. Appellant was not invited but came with others to the afterparty at Baldemar's house.

Josue S.R. was "hanging out" in Baldemar's garage with Baldemar's roommate, when "a large group [of] more than 50 people" arrived. Within minutes, a man came up behind Josue and demanded a beer. Josue turned around and asked the man "who he was" and what he was doing there

16

because he did not know him. In response, the man stabbed Josue in the left rib with what he believed was "an ice pick or screwdriver." Josue punched the man, backed away to outside the garage, and told his friend he "got stabbed."[9]

As Josue backed away from the man who had stabbed him, he tripped "or somebody else got [him] from the back" and then an "altercation resulted outside" the garage. Once on the ground, one or more people jumped on top of Josue and, as he was fighting back, Josue was repeatedly stabbed.

Baldemar heard "screaming" and saw people "scrambling." He then saw Josue on the ground with people on top of him. As Baldemar was trying to "throw the people off" Josue, he suddenly fell to the ground and realized both of his legs were "paralyzed."

Jose H., along with his wife Lucina H., heard a man yell he had been stabbed. Jose looked and Baldemar was "on top" of a man, "grabbing onto him" and "wrestling" with him on the floor. Jose went to separate Baldemar and the man when he heard Appellant say, "That's my homey."[10] Jose then saw Appellant stab Baldemar at least three times, including once in the head, with "a small knife" that had about a two to three-inch blade. Baldemar "fell over" and said "he couldn't feel his body." Lucina saw Appellant stab Baldemar about "nine or 11" times as Baldemar tried to defend himself.

---

9    Josue testified he saw the man who stabbed him "in court." But when the prosecutor asked him to identify the man in court by his clothing or where he was sitting, Josue said was unable to do so because he was "not familiar" with the man and had only a "quick" opportunity to see him.

10    Jose knew of Appellant through Appellant's brothers and knew his nickname was "Cheo."

17

Baldemar and Josue were taken to the hospital and treated by the same trauma surgeon. Josue suffered about 13 stab wounds and "many more lacerations," including one to his throat that was about two inches long and about "half [an] inch" wide.

Baldemar had been stabbed nine times. He had one stab wound or cut at the top of his head, and "two stab wounds at the base of the neck just below the hairline and then a series" of stab wounds that moved down the middle to the lower portion of his back. The trauma surgeon opined that Baldemar sustained "puncture wound[s]" that were "all made in a very similar manner with something . . . fairly small" but "sharp." He suffered "two major injuries," including a deep penetrating wound to the spinal column and spinal cord, which resulted in paralysis, and a deep penetrating puncture wound to his right lung. According to the trauma surgeon, Baldemar was "lucky to be alive." After a hospital stay of two or three months and rehabilitation work, Baldemar slowly regained use of his legs. But at the time of trial he still had not fully recovered from the attack.

B. *Appellant Stabbed His Ex-Girlfriend's Male Friend on November 9, 2017 (Counts 1 and 2)*

Yasmin was in a relationship with Appellant and they share a young daughter. After their relationship ended, Yasmin dated Hilario C. On November 9, 2017, Yasmin and Hilario were no longer dating but had remained friends.

At about 9:00 p.m. on November 9, Hilario drove Yasmin and Yasmin's daughter to their home after a trip to Tijuana. Yasmin and her daughter took some grocery bags inside the house while Hilario stayed in the car. It was dark and he had not heard any other cars drive up. Hilario then got out, grabbed a few bags of groceries and, as he walked to Yasmin's front door,

18

Appellant out of nowhere attacked him. Appellant first hit Hilario in the head with what he believed was "either a knife or a screwdriver." Hilario began bleeding and Appellant hit him twice more in the back. Appellant had not said a word to Hilario before he attacked.

Yasmin and Yasmin's mother, Reynalda S., ran outside and grabbed Appellant to stop him from further attacking Hilario. While Yasmin and her mother grabbed Appellant and tried to hold him back, Appellant threatened Hilario that "he was going to kill [him]."

Appellant then ran across the yard, with Yasmin yelling at him to leave. Once inside their home, Reynalda told Yasmin to take Hilario to the hospital because he was bleeding "a lot." After Yasmin and Hilario left for the hospital, Reynalda heard a "very loud sound" from outside the house. Reynalda went out the front door and saw Appellant running from Hilario's truck carrying a "tool" that he dropped across the street. Reynalda then saw the window to Hilario's truck had been smashed. Police later recovered a carjack near Hilario's truck; Appellant's DNA and fingerprints were on the carjack.

At the emergency room, Hilario was treated for a head wound, which required sutures to close, and three puncture wounds on his back. Hilario experienced a great deal of pain afterwards, which kept him out of work for more than a week. A few days after Appellant's attack, Hilario retrieved his truck from Yasmin's house, and a rear window had been smashed.

C.    *Defense*

The defense rested without presenting any evidence in the Knife Case.

D.    *Jury Verdicts*

The jury returned verdicts in the Knife Case trial in January 2020.

Based on the stabbing of Baldemar at the October 14, 2017 house party, the jury convicted Appellant of attempted murder (§§ 664/187, subd. (a); count 4) and assault with a deadly weapon (§ 245, subd. (a)(1); count 6). The jury found true the allegations that Appellant inflicted GBI on Baldemar in the commission of counts 4 and 6 (§ 12022.7, subd. (a)), and that he used a deadly weapon (§ 12022, subd. (b)(1)) in count 4. The jury deadlocked on the charges involving Josue as the victim, including his attempted murder (§§ 664/187, subd. (a); count 3) and assault with a deadly weapon (§ 245, subd. (a)(1); count 5). Counts 3 and 5 were then dismissed by the prosecutor after the trial court declared a mistrial as to those charges.

Based on the attack of Hilario, the jury convicted Appellant of attempted murder (§§ 664/187, subd. (a); count 1) and assault with a deadly weapon (§ 245, subd. (a)(1); count 2). The jury found true the allegations that Appellant inflicted GBI on Hilario in the commission of counts 1 and 2 (§ 12022.7, subd. (a)), and that he used a deadly weapon in the commission of count 1 (§ 12022, subd. (b)(1)).

DISCUSSION

I.

*Joinder of the Charges in the Gun Case Was Not an Abuse of Discretion,*
*nor Did It Violate Appellant's Due Process Rights*

Before trial, Appellant moved to sever the 23 counts he faced into five separate trials based on the five separate incident dates. The People moved to join all charges in one trial. The trial court denied the People's motion for joinder, and partially granted Appellant's motion for severance. The court ruled all the charges involving allegations that Appellant used a firearm would be tried first (the Gun Case), and all the charges involving allegations

20

that Appellant used a knife would be tried separately in a second trial (the Knife Case).

Appellant does not claim the trial court abused its discretion in ordering joinder of the knife-related charges. Appellant also concedes, in the joinder of the gun-related charges, "the statutory prerequisite . . . that the offenses be of the same class of crimes was satisfied" under section 954. But he contends the trial court abused its discretion and violated his due process rights by failing to order three separate trials for each of the three separate incidents giving rise to the gun-related charges. We conclude Appellant's contention lacks merit.

"Section 954, in relevant part, permits the joinder of 'two or more different offenses of the same class of crimes or offenses.' Joinder is ordinarily favored because it avoids the increased expenditures of funds and judicial resources that may result from separate trials. [Citation.] Joinder, therefore, 'is the course of action preferred by the law.' [Citation.] Nonetheless, a trial court has discretion to sever properly joined charges in the interest of justice and for good cause." (*People v. Simon* (2016) 1 Cal.5th 98, 122–123 (*Simon*).)

We review a trial court's joinder decision "in two steps. First, we examine whether, in light of the information available at the time, the trial court abused its discretion in denying the severance motion[.]" (*Simon, supra*, 1 Cal.5th at p. 122.) "Where, as here, the statutory requirements for joinder are met, a defendant must make a 'clear showing of prejudice' to establish that the trial court abused its discretion in denying the motion. [Citation.] A defendant seeking severance of properly joined charged offenses must make a *stronger* showing of potential prejudice than would be necessary

21

to exclude evidence of other crimes in a severed trial." (*Id*. at pp. 122–123, fn. omitted, italics added.) "Second, even if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges *actually* resulted in ' " 'gross unfairness' " ' amounting to a denial of due process[.]" (*Id*. at p. 123, italics added.)

A.    *We Find No Abuse of Discretion*

In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, we look at the record that was before the trial court when it made its ruling. (*People v. Thomas* (2012) 53 Cal.4th 771, 798 (*Thomas*).)  Doing so, we consider the following factors: "(1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether any of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case." (*Simon, supra*, 1 Cal.5th at p. 123; *Thomas*, at pp. 798–799.)  In weighing these factors, we determine " 'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' " (*Thomas*, at p. 798.)

As we have noted, Appellant concedes joinder was proper under section 954.  But he asserts joinder "impacted the fairness" of his trial because the evidence was not cross-admissible, some of the charges were particularly likely to inflame the jury, and each involved a weak case joined with a stronger case.  We are not persuaded.  Rather, we conclude Appellant has

failed to demonstrate a clear showing of potential prejudice, and thus no abuse of discretion, under the factors set forth in *Simon* and *Thomas*.

1. *Cross-Admissibility*

As the People conceded in the trial court, the evidence of the shooting outside the bar, the assaults with a firearm and criminal threats against Adolfo and Ninfa at their backyard, and the stabbing and shooting at the quinceañera were not cross-admissible in separate trials. "Although cross-admissibility of evidence is often an independently sufficient condition justifying a trial court's denial of severance it is *not a necessary one*." (*Simon, supra*, 1 Cal.5th at p. 123, italics added.) The trial court considered the absence of cross-admissible evidence but correctly noted it is "no longer a requirement" for joinder. (See § 954.1 ["evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact"].)

2. *Weak Case Joined with a Strong Case*

Appellant asserts the prosecution was permitted to "bootstrap" two weaker cases (the crimes against Adolfo and Ninfa, and the stabbing and shooting at the quinceañera) with a stronger case (the bar shooting that resulted in his brother's death). He argues the bar shooting was a stronger case because Appellant was captured on surveillance video assaulting Boban with a gun and then shooting Milan, and by accident his brother, and there was forensic evidence that Appellant fired the murder weapon. True. But, in our view, the evidence of Appellant's guilt as to the two other violent confrontations was just as compelling.

At the quinceañera on April 7, 2018, Patricia witnessed Appellant stab John twice in the chest area with an object that was "silver in color" after John had him in a headlock. Miguel, Patricia's younger brother, also

23

witnessed Appellant stab John with a "sharp, long" "ice pick."[11]  Both Patricia and Miguel knew Appellant because Appellant's brother was married to their sister.  Indeed, Miguel had known Appellant for a "good . . . fifteen-plus years."  Gerardo, who had also known Appellant for more than 15 years, identified Appellant as the gunman who pointed the gun at his girlfriend Claudia (at a distance of six feet or so) in the parking lot after the party ended, and then fired two shots, striking Artemio in the forehead with a grazing bullet.

Similarly, as we later discuss in further detail (see Section III, *post*), Appellant was reliably identified by Ninfa as the man who assaulted and threatened her and Adolfo at their backyard dinner party on July 22, 2018. Ninfa testified she picked out Appellant as the perpetrator from a police photographic line-up and she confirmed her identification of Appellant in court.  She explained she had met Appellant at her nephew's funeral, and that she had known Appellant's mother for more than 10 years, and also knew Appellant's girlfriend Yasmin and that Appellant had a daughter with Yasmin.

Although the crimes on April 7 and July 22, 2018 were not captured on surveillance video like the bar shooting, there is no serious question

---

[11]    We acknowledge the jury acquitted Appellant of the assault with a deadly weapon against John, as charged in count 13, but we discuss the evidence on this count because we consider the record before the trial court when it made its ruling in determining if there was an abuse of discretion. (*Thomas*, *supra*, 53 Cal.4th at p. 798.)  In their opposition to Appellant's motion for severance, the People provided the trial court with a detailed offer of proof on all the charged crimes, including count 13, which offer of proof was later borne by the evidence at trial.

24

Appellant was reliably and credibly identified as the perpetrator of these crimes by multiple people who knew him. Other than to point to a lack of video and forensic evidence, Appellant does not explain why the evidence on these other crimes was any less compelling. He suggests the jury's acquittal of the crimes of attempted criminal threats against Adolfo (§§ 664/422; count 5) and dissuading Adolfo from reporting a crime by force or threat (§ 136.1, subds. (b)(1) & (c)(1); count 6) from the July 22, 2018 incident, and the jury's acquittal of the assault with a deadly weapon of John (§ 245, subd. (a)(1); count 13) in the April 7, 2018 incident demonstrate these were the weaker cases.

We disagree. Appellant's argument overlooks that the jury convicted Appellant of three crimes against Adolfo, including *completed* criminal threats (§ 422; count 10), dissuading a witness by force or threat (§ 136.1, subds. (b)(1) & (c)(1); count 11), and assault with a semi-automatic firearm (§ 245, subd. (b); count 12). The jury's acquittal of assault with a deadly weapon based on the stabbing of John could be explained, not by weak evidence of his identification, but by Appellant's assertion of self-defense based on the evidence he attacked John only after John put him in a headlock.

We also disagree with Appellant's contention the People "conceded" that the crimes against Adolfo and Ninfa was "the weakest case." In support of the People's motion for joinder, the prosecutor argued: "You can look at each of these different cases, if you want to say the murder case or the stabbings, the two stabbings from 2017, and you can pick apart some are a little bit stronger, some are a little bit weaker than others. But on the whole . . . on the whole can these cases, can the individual incidents, stand on their own?" Answering his own question, the prosecutor argued strenuously each

25

case could stand on its own. But responding to the trial court's extensive questioning regarding joinder of all 23 charges, the prosecutor allowed that "if the [c]ourt is having concern in regards to *prejudice*," the case involving Adolfo and Ninfa "is going to be the first case to fall and the first case to be severed" because it is "the one with the gang evidence, [and] is of the one with the least amount of corroborating evidence." (Italics added.) The People made clear, however, it was not conceding that the cases should not be consolidated. Moreover, after putting the People to the task of justifying joinder of all 23 charges, which was denied, the trial court stated: "I agree with you the cases are relatively of equal weight."

As the prosecutor recognized, it "always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*People v. Soper* (2009) 45 Cal.4th 759, 781 (*Soper*).) The "salient point" in weighing relative strength "is that the proffered evidence was sufficiently strong in [each of the] cases." (*Ibid.*; accord *People v. Landry* (2016) 2 Cal.5th 52, 79 (*Landry*) [no prejudice where none of the counts were "supported by evidence that was so measurably stronger . . . that it would likely have had an improper spillover effect"].) As we have explained, we conclude the evidence of Appellant's guilt was sufficiently strong in each of the three gun-related incidents.

3. *Particularly Inflammatory Charges*

Appellant asserts joinder of all three gun-related incidents was "problematic" because some of the charges were particularly likely to inflame the jury. Specifically, he asserts, the charges involving the crimes against Adolfo and Ninfa were the only crimes with "inflammatory gang allegations,"

26

and the bar shooting was also inflammatory because it was captured on video and involved the killing of Appellant's own brother. We reject this assertion too.

Although the crimes against Adolfo and Ninfa were the only ones with associated gang enhancement allegations, there was evidence that Appellant also invoked his gang affiliation during the confrontations at the quinceañera. There Appellant was heard screaming, "I'm from *Mara*," or that he was a member of the "Mexican Mafia." While gang evidence "can be 'highly inflammatory' " (*Simon*, *supra*, 1 Cal.5th at p. 125), Appellant fails to explain why introduction of gang evidence *in this case* was sufficiently inflammatory that denial of severance constituted an abuse of discretion.[12]

As our high court explained in *Simon*, "the animating concern underlying this factor is not merely whether evidence from one offense is repulsive, because repulsion alone does not necessarily engender undue prejudice." (*Simon*, *supra*, 1 Cal.5th at p. 124.) Instead, "the issue is '*whether " 'strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." ' " (Ibid.*, italics added.)

Here, the crimes charged in each of the three incidents similarly involved Appellant's threats and/or use of lethal force against the victims—in

---

[12] Appellant states in his opening appellate brief, "the trial court commented, the gang evidence 'would potentially unusually inflame the jury because of the nature of gang evidence.' " However, the court's comment continued, "That factor by itself is not enough, by itself, to necessarily demand severance, but it's a factor that the [c]ourt can consider in deciding whether it's proper to join those counts with any of the remaining counts." After an extensive weighing of the factors, the court concluded "there is not substantial prejudice" to Appellant in joining the three gun-related incidents for a single trial.

the April 7, 2018 incident, he pointed a loaded gun at a woman's face at about a distance of six feet and then fired the gun twice, striking Artemio; in the July 22, 2018 incident, he racked the slide and pointed the gun at Adolfo and Ninfa while threatening to kill them if they called the police; in the September 22, 2018 incident, he pointed a loaded gun at Boban's head and then fired three shots, killing his brother and inflicting great bodily injury on Milan. We have already concluded joinder of the three incidents in the Gun Case did not result in the prosecution bolstering a weaker case with a stronger case. It thus follows, and Appellant does not show otherwise, that joinder did not result in strong evidence of a lesser but inflammatory crime being used to bolster a weak prosecution on another crime.

Moreover, here the gang evidence was not admitted for the purpose of implicating Appellant as the perpetrator in any one incident. (See *Simon*, *supra*, 1 Cal.5th at p. 126 [concluding gang evidence was not unduly inflammatory, in part, because "gang evidence here was neither relied on nor was it necessary to link [defendant] to the strongly supported [murder] charges"].) The gang evidence was also brief. In addition to the witnesses' recount of Appellant's injecting his gang affiliation into his commission of the crimes, the gang expert's testimony was short.[13] We therefore conclude Appellant has failed to demonstrate that the evidence from any one incident, when joined with the evidence from the others, was "likely to unusually inflame the jury" against him. (See *Simon*, *supra*, 1 Cal.5th at p. 123.)

---

[13] The gang expert's testimony filled less than 30 pages of the reporter transcript, out of 11 volumes.

28

In sum, we conclude Appellant has failed to establish a " 'clear showing' of potential prejudice" (*Simon, supra,* 1 Cal.5th at p. 123) under the factors set forth in *Simon* and *Thomas.* (*Ibid.*; *Thomas, supra,* 53 Cal.4th at pp. 798–799.) He thus cannot show the trial court abused its discretion in denying his motion to sever. (*Simon,* at p. 123.)

B.    *Joinder Did Not Result in Gross Unfairness*

Even if, as we have concluded, the trial court's ruling was proper as a matter of state law, "we must also determine 'whether events *after* the [trial] court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of [a] defendant's constitutional right to fair trial or due process of law.' " (*Simon, supra,* 1 Cal.5th at p. 129.) "[A] judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Id.* at pp. 129–130.)

In *Simon,* our Supreme Court concluded there was no due process violation because both sets of murder charges "were supported by strong evidence warranting conviction had the incidents been tried separately"; and because "the jury found [the defendant] guilty of first degree murder in the killings of [the teenagers], but only second degree murder [in the gang-related killing], 'strongly suggest[ing] that the jury was capable of weighing the evidence and differentiating among [the] various charges.' " (*Simon, supra,* 1 Cal.5th at p. 130.)

Similarly here, for reasons we have already given, the charges arising from all three incidents joined in the gun case were each supported by "relatively balanced" and sufficiently "strong" evidence. (See *Landry, supra,* 2 Cal.5th at p. 79; *Soper, supra,* 45 Cal.4th at p. 781; see also *People v.*

29

*Ybarra* (2016) 245 Cal.App.4th 1420, 1437 [no prejudice where "the strength of the evidence as to each incident was relatively balanced"].)

The jury was specifically instructed with CALCRIM No. 3515, which provides: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." Absent evidence to the contrary, "[w]e presume jurors understand and follow the instructions they are given, including the written instructions." (See *People v. Buenrostro* (2018) 6 Cal.5th 367, 431 (*Buenrostro*).) While Appellant was convicted of multiple counts, the jury acquitted him of counts 5 and 6 in connection with the July 22, 2018 incident at Adolfo and Ninfa's backyard, and of count 13 in connection with the April 7, 2018 incident at the quinceañera. Not unlike the circumstances in *Simon*, the record supports the inference that the jury in the instant case followed the instruction and was able to separately weigh the evidence and " 'differentiat[e] among [the] various charges.' " (See *Simon*, *supra*, 1 Cal.5th at p. 130.)

In light of the relatively equal strength of the evidence in each of the three incidents, and the inference the jury followed the trial court's instructions by separately considering the evidence in each count, as demonstrated by its acquittal of appellant on certain counts in *two* of those incidents, we conclude it was not "reasonably probable" that the jury was improperly "influenced by the joinder." (See *Simon*, *supra*, 1 Cal.5th at p. 130 [concluding no due process violation because it was not "reasonably probable" that the jury was improperly influenced by joinder of two sets of murder charges].) We thus reject appellant's claim his trial was " 'gross[ly] unfair[ ]' " as a result of joinder of the three gun incidents into a single trial. (See *id.* at p. 129.)

## II.

### *Sufficient Evidence Supported the Jury's Convictions*
### *on Counts 1 and 2 in the Gun Case*

Appellant contends there is insufficient evidence of premeditation to support his convictions for the first degree murder of his brother Antonio (§ 187, subd. (a); count 1) and attempted premeditated murder of Milan (§§ 664/187, subd. (a); count 2). He asks that we reduce the convictions to second degree murder and attempted second degree murder, respectively. We decline his request because we conclude substantial evidence supported the jury's findings of premeditation.

In reviewing a judgment for sufficiency of the evidence, we review the record in the light most favorable to the judgment to determine if there is substantial evidence from which any rational trier of fact could find each element of the crime beyond a reasonable doubt. (*People v. Staten* (2000) 24 Cal.4th 434, 460 (*Staten*).) We "presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) All conflicts in the evidence must be resolved in favor of the judgment. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.) "Because we must draw all inferences in support of the judgment, [a] defendant 'bears an enormous burden' when challenging the sufficiency of the evidence." (*People v. Vasco* (2005) 131 Cal.App.4th 137, 161.)

The unlawful killing of a human being is presumed to be murder in the second, rather than first, degree. (*People v. Anderson* (1968) 70 Cal.2d 15, 25 (*Anderson*).) First degree murder has the additional elements of willfulness, premeditation and deliberation. (*People v. Gomez* (2018) 6 Cal.5th 243, 282 (*Gomez*).) "These elements require 'more than a showing of intent to kill; the

31

killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that cause the death.' " (*Ibid.*) Importantly here, "[p]remeditation and deliberation can occur in a brief interval." (*People v. Memro* (1995) 11 Cal.4th 786, 863 (*Memro*).) " 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*Id.* at pp. 862–863.)

Our Supreme Court has explained that "evidence of planning, motive, and manner of killing is often relevant" to determining the existence of premeditation. (*Gomez, supra,* 6 Cal.5th at p. 282; *People v. Morales* (2020) 10 Cal.5th 76, 88–89; *Anderson, supra,* 70 Cal.2d at pp. 26–27.) Known as the *Anderson* factors, this list is not exhaustive or determinative, and reviewing courts need not give these categories any particular weight. (*Morales,* at p. 89.)

Here, we conclude the evidence, under the *Anderson* factors and viewed in the light most favorable to the judgment (see *Staten, supra,* 24 Cal.4th at p. 460), is more than sufficient for a rational jury to find beyond a reasonable doubt that Appellant acted with premeditation and deliberation.

First, a reasonable jury could conclude there is evidence of planning. Appellant left the bar frustrated after the bar's bouncer refused him entry. As Appellant, Antonio, and Edgardo left in Edgardo's truck, the truck peeled out of the parking lot. Milan's nephew, Boban, was standing outside the bar and "flipped . . . off" Appellant and his companions in the truck. Rather than continue on their way, Edgardo drove down the street, stopped at a stop sign, made a U-turn, and the men *returned* to the bar. Edgardo stopped the truck at a nearby intersection and dropped off Appellant and Antonio. Then, as

seen on the surveillance video, Appellant and Antonio walked a short distance back to the bar. During that walk, Appellant pulled a loaded gun from his waistband. He walked up to Boban, raised his arm and pointed the loaded gun at Boban's head, taunting him with the remark, "Not so bad now, motherfucker." Antonio began punching Boban in the face. And when Milan tried to stop the attack on his nephew, Appellant shot him multiple times from a short distance.

A reasonable jury could deduce from this record that Appellant's decision to return to the bar and each step of his conduct after that demonstrated he had sufficient time to reflect on his actions before shooting. That is sufficient circumstantial evidence of premeditation. (See *Memro*, *supra*, 11 Cal.4th at pp. 862–863; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [the defendants' request to the driver to turn the car around and return to a gas station to confront the victims was evidence of planning]; cf. *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [the defendant's testimony that he saw the victim's reflection in the mirror before turning around and stabbing her was evidence of planning, as it established defendant had sufficient time to reflect].)

Second, the manner in which Appellant attempted to kill Milan—firing three shots from a short distance—supports an inference of a premeditation to kill. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1081–1082 [shooting the victim in vital organs at close range shows premeditation and deliberation]; *People v. Morris* (1988) 46 Cal.3d 1, 23 [shooting the victim twice from close range supports an inference by the jury that the manner of killing was willful, deliberate, and premeditated]; *People v. Poindexter* (2006) 144 Cal.App.4th 572, 588 [the manner of killing supported findings of

33

premeditation and deliberation where the defendant used a shotgun to "quickly fire[ ] three shots at the victim . . . from a relatively close range"].) Here, as was seen in the surveillance video, Appellant took "a couple of small steps *forward*" after firing the first shot at Milan. (Italics added.) His advance on the victim while continuing to shoot further supports an inference of premeditated intent to kill.

Third, a rational jury could also reasonably find Appellant had a motive to kill Milan. The evidence established Appellant and Antonio returned to the bar and sought out Boban to assault him, at gunpoint. When Milan intervened to stop Appellant's and Antonio's assault of Boban, Appellant shot Milan multiple times from a short distance. While Appellant argues "the shooting appears to have been a '[h]asty, impetuous, rash, impulsive' decision," a rational jury could reasonably conclude Appellant shot Milan, who was clearly unarmed, with the purpose of incapacitating Milan and preventing him from stopping the assault on his nephew by Appellant and Antonio. While Appellant may have formed the decision to kill quickly, the true test is not time but reflection and a " ' "cold calculated judgment may be arrived at quickly." ' " (*Memro*, *supra*, 11 Cal.4th at p. 863.)

That the evidence *could* have supported different findings by the jury regarding planning or motive is not the test. Appellant made the same arguments in the trial court, as he does on appeal, urging the jury to agree with his interpretation of the evidence that there was no premeditation. The jury rejected that interpretation. As a court of review, we do not reweigh the evidence and the credibility of the witnesses, or make new or different findings from those of the factfinder when its findings are supported by substantial evidence. (See *People v. Ramirez* (2022) 13 Cal.5th 997, 1118 (*Ramirez*) [" ' " '[I]f the circumstances reasonably justify the jury's findings,

34

the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' " ' "].)

Viewing the entire record in the light most favorable to the verdicts, we find substantial evidence from which a reasonable jury could find beyond a reasonable doubt that Appellant shot Milan deliberately and with premeditation to support his conviction of attempted first degree murder. (See *People v. Bolin* (1998) 18 Cal.4th 297, 331 [a verdict will not be reversed for insufficient evidence unless it appears that upon no hypothesis whatsoever is there sufficient substantial evidence to support the verdict].)

That same evidence is sufficient to support Appellant's conviction for first degree murder of his brother. Although Milan was his intended target, Appellant's premeditated intent to kill was imputed under the doctrine of transferred intent to the death of his unintended target, Antonio. Under this common law doctrine, " ' a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had " 'the fatal blow reached the person for whom intended.' " [Citation.] In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.' " (*People v. Bland* (2002) 28 Cal.4th 313, 320–321 (*Bland*).)

Although the evidence showed that Milan was Appellant's intended target, "a person maliciously intending to kill is guilty of the murder of all persons actually killed." (*Bland, supra*, 38 Cal.4th at pp. 323–324.) Where, as here, the jury found the intent was premeditated as to the intended target—a finding we have concluded is supported by substantial evidence— the murder of the unintended target, Antonio, is in the first degree. (See *ibid.*; accord *People v. Vasquez* (2016) 246 Cal.App.4th 1019, 1026 [rejecting

defendant's argument that as an aider and abettor he could not be liable for first degree murder under the transferred intent doctrine, and concluding "the intent required for the crime at issue (here, intent to kill for premeditated murder) was already established with respect to [the intended victim] and was transferred to the ultimate victim"].)

In sum, we conclude sufficient evidence supported the jury's convictions of Appellant on counts 1 and 2 in the Gun Case.

### III.

*Sufficient Evidence Supported the Jury's Convictions*
*on Counts 7 Through 12 in the Gun Case*

Appellant contends there was insufficient evidence to prove he was the person who assaulted and threatened Adolfo and Ninfa on July 22, 2018, necessary to support his convictions on counts 7 through 12. He argues Ninfa was the only witness to identify him as the perpetrator of these crimes, and "there are serious flaws" with her identification. He again asserts the evidence of his guilt on these offenses was "weak," and the prosecutor conceded as much. We disagree.

In discussing Appellant's claim of error regarding joinder, we have already rejected his contention that the evidence identifying Appellant as the perpetrator of the July 22, 2018 crimes against Adolfo and Ninfa was "weak," and that the prosecutor made any such concession. We will not repeat that discussion here. Suffice it to say the evidence was more than sufficient to support a jury's finding beyond a reasonable doubt that it was Appellant who assaulted Adolfo and Ninfa with a gun and made criminal threats against them, in part to dissuade them from reporting his earlier break-in of Adolfo's brother's truck.

36

Appellant argues Ninfa's identification of him is unreliable because she had told police the perpetrator had "distinctive . . . blue eyes," when in fact Appellant's eyes are not blue. The jury heard Ninfa explain that she believed Appellant had "lighter [color] eyes, like light blue eyes" when she spoke with the police, but there was "no reason for [her] to be mistaken" about her identification of Appellant. She testified, "I know it's him. I know." The defense extensively cross-examined Ninfa about the perpetrator's eye color and urged the jury to reject her identification based on the alleged discrepancy in her statement regarding the perpetrator's eye color.

The jury was properly instructed on its role as factfinders and how to evaluate eyewitness testimony, and it did not accept the defense's interpretation of Ninfa's testimony. Potential conflicts in the evidence are for the jury to resolve, and where a jury has credited statements by a witness, we cannot reject those statements unless they are physically impossible or facially false, which clearly is not the case here. (See *People v. Friend* (2009) 47 Cal.4th 1, 40–41 [rejecting the defendant's argument that a witness's testimony was "inherently improbable" and therefore constitutionally insufficient merely because the testimony differed in some details from the witness's statements and prior testimony, noting the defendant's arguments "involve simple conflicts in the evidence that were for the jury to resolve"].) Because substantial evidence supports the jury's finding beyond a reasonable doubt that Appellant was the man who assaulted and threatened Ninfa and Adolfo with a firearm during the July 22, 2018 incident, we reject this claim of insufficient evidence as to counts 7 through 12.

*Assembly Bill 333 Requires We Vacate the Jury's True Findings on the Gang Enhancements as to Counts 7 Through 12, but Not the Entire Judgment*

In convicting Appellant of the July 22, 2018 crimes against Adolfo and Ninfa—criminal threats (§ 442; counts 7 and 10), dissuading a witness from reporting a crime by force or fear (§ 136.1, subds. (b)(1) & (c)(1); counts 8 and 11), and assault with a semiautomatic firearm (§ 245, subd. (b); counts 9 and 12)—the jury also found true the sentencing enhancement allegations that Appellant committed those offenses for the benefit of, at the direction of, or in association with a criminal street gang under former section 186.22, subdivision (b) (the gang enhancements).

While Appellant's appeal was pending, the Legislature enacted Assembly Bill 333 to amend section 186.22 to impose additional elements necessary to prove the gang enhancements under subdivision (b). Relevant here, Assembly Bill 333 amended the definition of what constitutes "a criminal street gang" and "a pattern of criminal gang activity," and added section 1109 requiring bifurcation of the gang enhancement upon the defendant's request.

Appellant contends Assembly Bill 333 applies retroactively to his case and thus the true findings on the gang enhancements must be reversed because the prosecution's proof of the gang enhancements did not satisfy amended section 186.22, subdivision (b). As the People properly concede this contention, we agree the gang enhancements must be vacated and the People may retry him as to these allegations on remand.

Appellant further contends new section 1109 applies retroactively and the entire judgment in the Gun Case must be reversed because he is entitled

to an entirely new, bifurcated trial as a result. This contention we reject. Appellant is not entitled to reversal of the underlying convictions because, assuming error under new section 1109, we conclude it was harmless.

A. *The Gang Enhancements Shall Be Vacated*

When Appellant was tried in 2019, former section 186.22 defined a " 'criminal street gang' " as "any ongoing organization, association, or group of three or more persons . . . whose members *individually* or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Assembly Bill 333 removed the word "individually" from the definition, now requiring the members to "*collectively* engage" in a pattern of criminal gang activity. (§ 186.22, subd. (f), italics added.) Thus, under the new law, the People must "prove that two or more gang members committed each predicate offense." (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1072 (*Delgado*); *People v. Lopez* (2021) 73 Cal.App.5th 327, 344–345 (*Lopez*).)

Assembly Bill 333 also amended the required proof for establishing the predicate offenses. Former section 186.22, subdivision (e), defined a " 'pattern of criminal gang activity' " as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [33 enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, by two or more persons." (Former § 186.22, subd. (e).)

Now, following Assembly Bill 333, the predicate offenses must have been committed by two or more "members" of the gang, as opposed to

39

"persons"; the offenses must have "commonly benefited a criminal street gang, and the common benefit from the offenses [must be] more than reputational"; at least one of these predicate offenses must occur after the effective date of the new law, and the last of those offenses must have occurred "within three years of the prior offense and within three years of the date the current offense is alleged to have been committed." (§ 186.22, subd. (e)(1).) The currently charged offense also no longer counts as a predicate offense. (§ 186.22, subd. (e)(2).)[14] New section 186.22, subdivision (g), provides that: "Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

We agree, as the People have conceded, that the amendments to section 186.22 apply retroactively to Appellant. Under the *Estrada* rule, we presume, absent evidence to the contrary, that statutes that reduce punishment for criminal conduct apply retroactively to all defendants whose sentences are not final on the statute's operative date. (*In re Estrada* (1965) 63 Cal.2d 740, 742–745 (*Estrada*); see *People v. Frahs* (2020) 9 Cal.5th 618, 624–626; *People v. Brown* (2012) 54 Cal.4th 314, 323.) As our high court has recently held, by increasing the threshold requirements of a conviction on the active gang participation offense and the gang enhancement allegation pursuant to section 186.22, subdivisions (a) and (b)(5), respectively, Assembly

---

14    The amendments also removed four categories of enumerated offenses that would qualify as a predicate act, none of which are relevant to this case.

Bill 333 is ameliorative on some sentences, and is therefore retroactive under the *Estrada* rule. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207 (*Tran*); accord *Lopez, supra*, 73 Cal.App.5th at p. 344 [concluding the amendments to section 186.22 implemented by Assembly Bill 333 are retroactive because they "increase[ ] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement"].)

The People also concede the gang enhancements must be vacated because the predicate offenses they presented to prove the pattern of criminal activity failed to establish the gang members committed the crimes collectively, and the evidence was insufficient to demonstrate the predicate offenses benefited the gang in a manner that was "more than reputational," as is required under the new law. (§ 186.22, subds. (e)(1) and (f).) On this record, we accept the People's concessions as proper.

On remand, the People shall be afforded the opportunity to retry Appellant on the gang enhancements pursuant to section 186.22, subdivision (b), as amended by Assembly Bill 333. (See *Lopez, supra*, 73 Cal.App.5th at p. 346; accord *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [the "proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges"]; *Delgado, supra,* 74 Cal.App.5th at p. 1091 [remanding the case to allow the People an opportunity to retry the defendant following reversal of his gang enhancements based on Assembly Bill 333].)[15]

---

[15] Appellant also contends the People presented insufficient evidence to prove the gang enhancements even under then-existing law and the gang enhancements must be reversed because the People failed to establish counts

41

B.   *Any Error Under Section 1109 Was Harmless and Appellant Is Not Entitled to Reversal of the Entire Judgment in the Gun Case*

Assembly Bill 333 also added section 1109, a new procedural provision. Section 1109 provides, in relevant part, "If requested by the defense, a case in which a gang enhancement is charged under subdivision (b) or (d) of Section

7 through 12 were "gang-related."  We disagree.  Unlike the recent Supreme Court decision in *People v. Renteria* (2022) 13 Cal.5th 951, on which Appellant relies, in this case there is sufficient evidence of a nexus between the underlying felonies and Appellant's gang activities to support the jury's true findings on the gang enhancements.  This evidence included his statements to Ninfa that he was from "Westside" and a "badass," that they didn't appreciate who "he" was as they were living in "his" neighborhood, and that he also had "friends" and if they called the police either he, or by inference, other Westside gang members would return and put "fucking bullets" in them.  As *Renteria* makes clear, and as Appellant acknowledges, an expert opinion based on a hypothetical is sufficient to support imposition of gang enhancements so long as the opinion is not based on assumption of fact, speculation, or conjecture.  Here, the gang expert relied on evidentiary facts, presented in a proper hypothetical, to opine that Appellant committed counts 7 through 12 to benefit the Westside gang with the specific intent to promote that gang. (See *Renteria*, at p. 967 [noting its previous holdings that " ' "[e]xpert opinion that particular criminal conduct benefited a gang" is not only permissible but can be sufficient to support the [former] section 186.22, subdivision (b)(1), gang enhancement' " as long as the hypothetical is " ' "rooted in facts shown by the evidence" ' " and not merely based " ' " 'on assumptions of fact without evidentiary support' " ' "].)  Because our reversal of the gang enhancements is not predicated on a finding the trial evidence was insufficient to sustain the jury's true findings, the People are not barred from retrying Appellant on the gang enhancements under the new law.  (See *People v. Hernandez* (2003) 30 Cal.4th 1, 6 ["As a general rule, it is well established that if the defendant secures on appeal a reversal of his conviction based on trial errors other than insufficiency of evidence, he is subject to retrial."]; *In re D.N.* (2018) 19 Cal.App.5th 898, 902 ["Where the prosecution makes its case under the law as it stood at trial, double jeopardy is not implicated as it would otherwise be where there is evidentiary insufficiency."].)

186.22 shall be tried in separate phases[.]" (§ 1109, subd. (a).) The question of defendant's guilt on the underlying offense must be determined first. (§ 1109, subd. (a)(1).) If the defendant is found guilty, "there shall be further proceedings to the trier of fact on the question of the truth of [any] enhancement" under section 186.22, subdivisions (b) or (d). (§ 1109, subd. (a)(1) & (2).)

Appellant contends section 1109 applies retroactively to his case under the *Estrada* rule and requires reversal of the entire judgment. He further contends the admission of gang evidence rendered his trial fundamentally unfair and the failure to bifurcate constituted structural error and, if reviewable for prejudice, was prejudicial under any standard. The People respond that Appellant forfeited this claim by not requesting bifurcation of the gang enhancements in the trial court, under section 1044.[16] If not forfeited, the People assert section 1109 does not apply retroactively because it is merely a change in trial procedure, and that even if section 1109 applies retroactively, reversal is not warranted because the failure to bifurcate the gang enhancements in this case was harmless.

Appellate courts are currently divided as to whether section 1109 applies retroactively, and this issue is now before the California Supreme Court. (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 566–567,

---

[16] "Although no statute [then] require[d] bifurcation, [the California Supreme Court has] found authority to bifurcate trial issues 'in section 1044, which vests the trial court with broad discretion to control the conduct of a criminal trial: "It shall be the duty of the judge to control all proceedings during the trial . . . with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." ' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).)

review granted July 13, 2022, S274743 [§ 1109 applies retroactively under *Estrada*]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 (*Ramos*) [same]; *People v. Montano* (2022) 80 Cal.App.5th 82, 105–108 [same]; with *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090 [holding § 1109 is not retroactive]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341 [same]; *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 14, 2022, S277103 [same].) In *Tran*, the California Supreme Court declined to resolve this split, finding that any error in failing to bifurcate the trial of the gang enhancements was harmless. (*Tran, supra*, 13 Cal.5th at p. 1208.)

In *Tran*, our high court also rejected the contention, advanced by Appellant here, that failure to bifurcate a trial pursuant to section 1109 constitutes structural error. (*Tran, supra*, 13 Cal.5th at p. 1208.) We adhere to this holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The high court also held the failure to bifurcate gang enhancement allegations in accordance with section 1109 does not necessitate review under the heightened *Chapman* standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [reversal is required under the federal Constitution unless the error was harmless beyond a reasonable doubt].) Rather, " '[t]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.' " (*Tran*, at p. 1209.) Finding no such fundamental unfairness in the use of gang evidence in the defendant's trial, the high court applied the *Watson* standard for reviewing state law error. (*Ibid*.; see *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [reversal is required only if the defendant shows it is reasonably probable a more favorable result would have been reached in the absence of the error].)

As our high court did in *Tran*, we similarly conclude, even assuming section 1109 applies retroactively and Appellant preserved this issue for appeal, that the admission of gang evidence did not render Appellant's trial fundamentally unfair, and that the failure to bifurcate trial of the gang enhancements was harmless under the *Watson* standard.

First, we agree with the People that most of the gang evidence presented to the jury would have been admissible to establish other issues relevant to Appellant's guilt even absent the gang enhancements. "[N]othing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132; see *People v. Chhoun* (2021) 11 Cal.5th 1, 31 ["The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense."].) Gang evidence, " 'including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Chhoun*, at p. 31, quoting *Hernandez*, *supra*, 33 Cal.4th at p. 1049.)

In assaulting Adolfo and Ninfa with a firearm and threatening to kill them, Appellant injected his gang status into the crimes in order to make his threats of lethal force credible, to place his victims in sustained fear, and to dissuade them from reporting his crimes to the police. Appellant asserted, "I'm a big motherfucker," "This is my neighborhood," and "You don't know who I am . . . a badass from the mafia" when he threatened Adolfo and Ninfa not to call the police. He said he was from "Westside," and told Ninfa again not to call the police and that "he had friends." Appellant is not entitled to

have the evidence sanitized where he himself uses his gang affiliation in order to commit the crimes. (See *Ramirez, supra,* 13 Cal.5th at p. 1096 [introduction of gang evidence proper "where the defendant himself identifies gang affiliation as a motive"]; *Hernandez, supra,* 33 Cal.4th at pp. 1050–1051 [rejecting defendant's argument that gang evidence caused him undue prejudice when defendant, before robbing the victim, "injected his gang status into the crime" by identifying himself as a gang member and using "that status in demanding money from the victim"].)

Further, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and . . . [a]n explanation of the basis for the witness's fear is likewise relevant to [his] credibility[.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869, citations omitted.) Here, Appellant succeeded in instilling fear by invoking his gang status with his victims. The gang evidence was relevant to explaining to the jury why Adolfo and Ninfa did not call the police; they testified they did not report Appellant because they were "frightened" and "scared" he would make good on his threats. Thus, given the circumstances of how Appellant committed his crimes, "it is likely some, though not all, of the [gang] evidence . . . would have come in at a trial on just the substantive offenses" to prove such issues as motive and intent, means of applying force or fear, and to explain the circumstances surrounding the offenses. (*Ramos, supra,* 77 Cal.App.5th at p. 1132.)

Second, the trial court instructed the jury with CALCRIM No. 1403[17] that it could use evidence of gang activity "only" for a "limited purpose," but not for the purpose that Appellant "is a person of bad character or that he has a disposition to commit crime." Absent evidence to the contrary, we presume the jury followed this instruction. (See *Buenrostro*, *supra*, 6 Cal.5th at p. 431.) That the jury acquitted Appellant of counts 5 and 6 involving Adolfo, and count 13 involving the stabbing of John at the quinceañera, tends to demonstrate the jury followed the instruction and did not convict him on the mere basis of his gang affiliation.

Finally, as we have already concluded, the evidence of Appellant's guilt on all the charges decided by the jury in the Gun Case was strong. Again, we need not repeat the discussion here. (See Sections I.A.2, II, and III, *infra*.)

Under these circumstances, we conclude Appellant has failed to demonstrate he would have achieved a more favorable outcome at trial on the underlying charges had the gang enhancements been separately tried in a bifurcated proceeding. (See *Tran*, *supra*, 13 Cal.5th at pp. 1208–1209; *Watson*, *supra*, 46 Cal.2d at p. 836.) In light of our decision, we reject Appellant's contention that reversal is required because the gang evidence

---

17    CALCRIM No. 1403 provides: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged; [¶] OR [¶] The defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

was so prejudicial that it rendered his trial on the underlying offenses fundamentally unfair.

## V.

### *Appellant Has Failed to Establish Prejudicial Prosecutorial Error in the Knife Case*

Appellant contends his convictions in the Knife Case of attempted premeditated murder of Hilario, attempted murder of Baldemar, and assault with a deadly weapon on Baldemar (counts 1, 4, and 6, respectively) must be reversed because the prosecutor committed prejudicial error by showing the jury two photographs of Appellant apparently making gang signs with his hands, and when she referred to Appellant's "booking" photograph in examination of a witness. We reject these contentions and conclude the asserted errors did not rise to the level of "prosecutorial error," and even assuming it did, there was no prejudice.[18] (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 ["[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error."].)

---

[18] The People contend Appellant forfeited these claims of error by failing to object to the asserted errors specifically as prosecutorial misconduct, and by failing to request a curative instruction both times. (See *People v. Tully* (2012) 54 Cal.4th 952, 1010 (*Tully*) [" 'a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury' "].) Without deciding whether there has been forfeiture, we exercise our discretion to review the claims on the merits. (*People v. Williams* (2009) 170 Cal.App.4th 587, 628.)

A.    *The Asserted Prosecutorial Errors*

    1.    *Reference to Photographs of Appellant Making Gang Signs*

After the prosecutor gave her opening statement, defense counsel raised concerns at a sidebar conference that the prosecutor had "put up pictures of [Appellant] flashing gang signs," in violation of the trial court's in limine ruling that there would be "no reference to any potential gang involvement between [Appellant] and the victims" in the Knife Case. Defense counsel asked for a mistrial, arguing there was no relevance to the photographs and "[t]he only reason" he thought the prosecutor "would possibly do that would be to inflame the jury."

The prosecutor explained she had shown the jury "two photos that Hilario . . . had sent to the detective" to identify Appellant as the man who had attacked him outside Yasmin's house. The prosecutor admitted her mistake, and although she worked in the district attorney's "gang unit," she explained it was an "oversight" on her part that Appellant was making gang signs in the photograph. The prosecutor apologized and noted the photographs were shown to the jury "maybe, being generous, for ten seconds." She offered to withdraw the photographs as exhibits and requested the court again instruct the jury that the attorneys' statements are not evidence.

Defense counsel responded to the prosecutor's explanation that he did "bear some responsibility" for the jury seeing the objectionable photographs. Counsel acknowledged the prosecutor had provided him with copies of all the exhibits she intended to use at trial, including the objectionable photographs, but that he also "didn't catch it." Although he accepted that "it's partly defense counsel's fault as well" that the photographs were shown to the jury, counsel argued "it's not [Appellant's] fault [he] has been prejudiced."

49

The trial court declined to declare a mistrial, and agreed the prosecutor's suggestion of withdrawing the exhibits altogether was the appropriate remedy. The court then asked the attorneys if there was "[a]nything else?" and defense counsel responded, "No, your Honor."

2.     *Reference to Appellant's "Booking" Photograph*

The officer who responded to Yasmin's house regarding the November 9, 2017 assault of Hilario testified Reynalda, Yasmin's mother, had identified Appellant by name as Hilario's attacker. The prosecutor then asked the officer the following two questions:

"Q  Were you able to look up that name?

"A  I was.

"Q  And were you able to pull up a *booking* photo?

"A  I was."  (Italics added.)

Defense counsel objected and requested a sidebar conference. Outside the presence of the jury, defense counsel stated, "I'm curious to know why the prosecutor wants to put into evidence that [Appellant] has been arrested previously?" Defense counsel argued Appellant was prejudiced by the prosecutor's reference to the exhibit as a "booking photograph," because "the only thing a jury can infer is that [Appellant] now has a prior history of arrests."

The prosecutor explained she was attempting to have the officer confirm Reynalda's identification of Appellant as Hilario's attacker, that there had already been testimony of "another incident prior," and that she could further sanitize the testimony if necessary.

The trial court sustained defense counsel's objection "that it was improper to refer to th[e] photograph as a booking photograph," and admonished the prosecutor "to make no references to any photographs as

50

booking photographs unless it's the booking photograph from this arrest from these two [knife-related] inciden[ts]" and "to advise all of their witnesses not to make any comments about any prior arrests for [Appellant]."

Defense counsel had informed the trial court that it would "deliberate" on whether to request a curative instruction, noting that "oftentimes a curative instruction just makes it worse for the defense." Defense counsel never requested a curative instruction or any other remedy for the asserted error.

B. *Analysis*

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established.' " (*People v. Navarette* (2003) 30 Cal.4th 458, 506.) "A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects ' "the trial with unfairness as to make the resulting conviction a denial of due process." ' " (*People v. Mendoza* (2007) 42 Cal.4th 686, 700 (*Mendoza*).) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor. [Citation.] Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid*.) " 'A defendant's conviction will not be reversed for prosecutorial [error], however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*Tully, supra,* 54 Cal.4th at p. 1010; accord *People v. Young* (2019) 7 Cal.5th 905, 932–933 (*Young*).)

We conclude that neither the prosecutor's display of two photographs of Appellant making gang signs for 10 seconds in opening statement, nor the prosecutor's one mention of a "booking" photograph (in the context of

establishing a victim's prior identification to the police) comprised "a pattern of conduct so egregious that it infect[ed] ' "the trial with unfairness as to make the resulting conviction a denial of due process" ' " under federal law. (*Mendoza, supra*, 42 Cal.4th at p. 700.) And neither instance involved the prosecutor's " ' " 'use of deceptive or reprehensible methods to attempt to persuade either the court or the jury' " ' " so as to violate due process under California's constitution. (*Ibid.*)

Both asserted errors were so fleeting, it is questionable whether the jury even noticed or understood the significance of the photographs or the mention of a "booking photograph." Indeed, defense counsel admittedly failed to notice Appellant was making gang signs in the photographs, even after having them in his possession for at least a week before trial and having reviewed them on the morning before opening statements. Further, we did not locate in the record on appeal, nor has Appellant suggested there were any further references by the prosecutor of Appellant's gang affiliation or prior arrests for the remainder of trial. Under these circumstances, we cannot say the prosecutor committed error that violated federal or state law.

Even assuming prosecutorial error, Appellant has failed to establish that " 'it is reasonably probable that a result more favorable to [him] would have been reached without the [asserted error].' " (*Tully, supra*, 54 Cal.4th at p. 1010; *Young, supra*, 7 Cal.5th at pp. 932–933.) There was strong evidence of Appellant's guilt on the counts for which he was convicted.

The jury convicted Appellant of the attempted murder of Baldemar in count 4 (§§ 664/187, subd. (a)), assault with a deadly weapon on Baldemar in count 6 (§ 245, subd. (a)(1)), and found true he inflicted GBI on Baldemar as to both counts (§ 12022.7, subd. (a)). Two witnesses credibly identified

Appellant as Baldemar's assailant. Jose testified he saw Appellant stab Baldemar at least three times, including once in the head area, with a "small knife." Lucina saw Appellant stab Baldemar about "nine or 11" times as Baldemar tried to defend himself. Baldemar indeed suffered one stab wound or cut at the top of his head, consistent with Jose's observations, and a total of nine stab wounds, consistent with Lucina's observations. The stab wounds were to the extremely vulnerable areas of the head and the spinal cord. As the trauma surgeon testified, Baldemar was "lucky to be alive" given the potentially fatal wounds inflicted by Appellant.

The jury convicted Appellant of the attempted premeditated murder of Hilario in count 1 (§§ 664/187, subd. (a)), the assault with a deadly weapon on Hilario in count 2 (§ 245, subd. (a)(1)), and found true he inflicted GBI on Hilario as to both counts (§ 12022.7, subd. (a)). Here also Appellant was credibly identified by Hilario, who knew Appellant on account of his relationship with Appellant's ex-girlfriend, and by the ex-girlfriend's mother Reynalda. Further still, Appellant's DNA was found on a carjack located at the crime scene, after Reynalda saw him running from Hilario's truck carrying a "tool" that he had used to smash a window on Hilario's truck. The jury reasonably could conclude there was premeditation from the circumstantial evidence that Appellant was waiting for Yasmin and Hilario when they returned from their trip to Tijuana. Hilario testified he did not hear any cars drive up while he waited in Yasmin's car, that Appellant attacked him out of nowhere, and that Appellant attacked him without saying a word.

Given the overwhelming evidence of Appellant's guilt on the charges that resulted in convictions, we conclude Appellant has failed to establish he was prejudiced by any asserted prosecutorial error. (See *Young, supra,* 7

53

Cal.5th at p. 933 [finding "no reasonable probability that the prosecutor's fleeting remark had any effect on the jury, particularly given the overwhelming evidence of defendant's guilt"]; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1344 [finding the misconduct harmless because of "strong evidence" of guilt]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1407 [same].) Moreover, the trial court instructed the jury several times that the statements of the attorneys are not evidence. (See CALCRIM No. 222.) The jury's inability to reach verdicts on the attempted murder and assault of Josue at Baldemar's house party (counts 3 and 5) tends to show that the jury followed the court's instructions and decided the case based on the evidence, without any influence by the asserted prosecutorial errors.

In sum, we reject Appellant's contention he was denied a fair trial and his convictions were the result of any prejudicial prosecutorial error.

VI.

*On Remand, Following Reversal of the Gang Enhancements, Current Sentencing Laws Shall Apply Under the Full Resentencing Rule*

Appellant contends he is entitled to a new sentencing hearing as a result of Senate Bill No. 567 (2021–2022 Reg. Sess.) and Assembly Bill No. 518 (2021–2022 Reg. Sess.), which became effective during the pendency of his appeal. He also requests the benefit of Senate Bill No. 81 (2021–2022 Reg. Sess.). Appellant further contends the abstract of judgment should be amended to show that the indeterminate sentence on count 1 in the Knife Case runs concurrent to the sentence in the Gun Case, because the trial court failed to specify its intentions concerning this count during its oral pronouncement of judgment. (See § 669, subd. (a).)

Because we are remanding the matter for further proceedings, following our vacatur of the gang enhancement allegations pursuant to

54

section 186.22, subdivision (b), on counts 7 through 12 in the Gun Case, we need not address the merits of Appellant's claims regarding retroactive application of sentencing laws that became effective during his appeal. Appellant will have to be resentenced on remand, and the trial court will be required to apply current sentencing law at the time of resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].) As a result, Appellant will have the opportunity to argue before the sentencing court that he is entitled to the benefit of any amendments to sections 1170, subdivision (b), 1385, and 654. At that time, the trial court can clarify whether it intended to run the sentence on count 1 in the Knife Case concurrent or consecutive to the sentence in the Gun Case. (See *Buycks*, at p. 89 [on remand, "the resentencing court has jurisdiction to modify *every* aspect of the sentence, and not just the portion" that was the basis of the resentencing hearing].)

## DISPOSITION

The jury's true findings on the gang enhancement allegations pursuant to section 186.22, subdivision (b), attached to counts 7 through 12 in case No. SCN400711, are vacated. The matter is remanded to the superior court. On remand, the People shall have the opportunity to retry Appellant on the gang enhancement allegations on counts 7 through 12 in conformance with current law. The court shall then resentence Appellant in light of the outcome of those proceedings, and in accordance with the sentencing laws in effect at the time of resentencing. The court shall also clarify whether Appellant's sentence on count 1 in case No. SCN391380 is to run concurrent

55

or consecutive to the sentence imposed in case No. SCN400711. In all other respects, the judgment is affirmed.

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


BUCHANAN, J.

56